*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 65**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

YELFRIS SOSA-HURTADO,
*Petitioner.*

No. 20180243
Heard November 16, 2018
Filed October 31, 2019

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Denise P. Lindberg
No. 121902927

Attorneys:

Herschel Bullen, Salt Lake City, for petitioner

Sean D. Reyes, Att'y Gen., Karen A. Klucznik, Asst. Att'y Gen.,
Salt Lake City, for respondent

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court in
which CHIEF JUSTICE DURRANT and JUSTICE PETERSEN joined.

JUSTICE PEARCE authored an opinion dissenting in part in which
JUSTICE HIMONAS joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 A jury convicted Yelfris Sosa-Hurtado of aggravated murder. On appeal Sosa-Hurtado challenged his conviction on the ground that there was insufficient evidence to sustain the charged aggravator for his conviction—a determination under Utah Code section 76-5-202(1)(c) that he placed another person at "great risk of death" when he killed his victim. He also asserted that the district court abused its discretion when it denied his motion for a new trial. The court of appeals concluded that there was sufficient evidence to

support the "great risk of death" aggravator. And it affirmed the district court's decision to deny the motion for a new trial.

¶2    Sosa-Hurtado raises the same arguments on *certiorari* in this court. And we likewise reject them. We first affirm the aggravated murder conviction. In so doing we reaffirm and clarify the standard set forth in our case law for a determination that a murder was committed under circumstances in which the defendant caused a "great risk of death" to another person. We hold that the risk of death need not result directly from the precise act that caused the victim's death. Clarifying and extending the standard set forth in *State v. Pierre*, 572 P.2d 1338 (Utah 1977), and *State v. Johnson*, 740 P.2d 1264 (Utah 1987), we hold that Utah Code section 76-5-202(1)(c) may be satisfied if the great risk of death was created within a "brief span of time" of the act causing the murder and the acts together "formed a concatenating series of events." *Pierre*, 572 P.2d at 1355. We identify factors of relevance to this inquiry, including (1) the temporal relationship between the murderous act and any acts endangering a third person; (2) the spatial relationship between the third party, the murder victim, and the defendant at the time of the acts constituting the murder; and (3) whether and to what extent the third party was actually threatened by the assailant. *See State v. Sosa-Hurtado*, 2018 UT App 35, ¶ 31, 424 P.3d 948 (identifying these factors, which we endorse here). And we hold that there was a reasonable basis for the jury in this case to conclude that Sosa-Hurtado caused a great risk of death to another in the circumstances of the murder at issue.

¶3    We also affirm the denial of the motion for a new trial. We agree with the court of appeals that the district court acted well within its discretion in declining Sosa-Hurtado's request to submit supplemental evidence in support of his motion for a new trial after the ten-day time limit for filing such a motion under rule 24 of our rules of criminal procedure. And we likewise conclude that the district court did not err in its denial of the motion on its merits.

I

¶4 Stephen Chavez and his father Isabel Chavez worked at a small smoke shop in Salt Lake City.[1] One day Isabel noticed a car parked outside in a manner that could endanger patrons of the shop. Isabel approached the driver of the car, Sosa-Hurtado, and twice asked him to move his car. Sosa-Hurtado refused. Stephen then went outside and asked Sosa-Hurtado to move the car. Sosa-Hurtado again refused and punched Stephen. Stephen fought back and told Sosa-Hurtado to leave. Sosa-Hurtado left.

¶5 Sosa-Hurtado then met with a friend, Vladimir Suarez-Campos, and the two of them crafted a plan to return to the smoke shop to fight Stephen. They returned to the shop and Sosa-Hurtado went inside. Suarez-Campos stayed outside.

¶6 The smoke shop consisted of a single room that was approximately fifteen feet wide and twenty-four feet long. A glass counter extended across most of the north side of the shop. Another stretched across the longer east side. The shop had one door along the west wall that faced the counter along the east.

¶7 Sosa-Hurtado entered the smoke shop and pulled an assault rifle from his jacket. According to Isabel's testimony, when Sosa-Hurtado entered the shop, Stephen and Isabel were standing three to four feet apart from each other behind the counter. A witness who was inside of the shop at the time of the shooting, however, said that Isabel and Stephen were closer—perhaps only two feet apart. Stephen stood at the cash register behind the north counter while Isabel stood behind the east counter. Sosa-Hurtado fired one shot at Isabel with his assault rifle, missing him but shattering a glass case, which hurled glass and wood into Isabel's leg, causing him to fall to the ground.

¶8 Sosa-Hurtado then turned towards Stephen. He fired a shot at Stephen, which hit Stephen's hand. Stephen fell on the floor behind the counter. Isabel began to get up and move towards Stephen. With his back to Isabel, Sosa-Hurtado leaned over the counter, positioned the rifle only inches from Stephen's chest, and shot him twice more. These shots killed Stephen. Only a few feet

---

[1] "On appeal, we construe the record facts in a light most favorable to the jury's verdict." *State v. Maestas*, 2012 UT 46, ¶ 3, 299 P.3d 892 (internal quotation marks and citation omitted).

away, Isabel felt the air displaced by the bullets. Sosa-Hurtado exited the smoke shop and fired several shots into the air outside.

¶9   The State charged Sosa-Hurtado with aggravated murder, discharge of a firearm with injury, and eight counts of discharge of a firearm. The aggravated murder charge was based on the "great risk of death" aggravator under Utah Code section 76-5-202(1)(c).

¶10   The State also charged Suarez-Campos with murder and nine counts of discharge of a firearm. During trial, Suarez-Campos testified for the State pursuant to a plea agreement that would reduce his charges from murder and multiple counts of discharge of a firearm to manslaughter. Suarez-Campos explained that, without the plea agreement, he believed he could face twenty to twenty-five years of imprisonment.

¶11   Sosa-Hurtado's counsel asked Suarez-Campos about a pending aggravated burglary charge against him and suggested that the charge would also be dismissed as part of his plea deal. During a side bar conversation, the prosecution stated that the State's agreement to dismiss the aggravated burglary charge required that Suarez-Campos agree to testify against Sosa-Hurtado in that case as well (Sosa-Hurtado had also been charged with the aggravated burglary, among other charges, in a separate case). Sosa-Hurtado's counsel stated that Suarez-Campos's counsel had informed him that the aggravated burglary charge would be dismissed in exchange for his testimony in the aggravated murder case alone. The State reiterated that the plea deal with Suarez-Campos was predicated on his agreement to testify in the aggravated burglary case.

¶12   Sosa-Hurtado's counsel ceased questioning Suarez-Campos on the issue to prevent the State from introducing evidence that Sosa-Hurtado was charged with aggravated burglary in a separate matter. Sosa-Hurtado's counsel then apologized to the jury for his error in raising the topic, and the district court instructed the jury to disregard any reference or discussion relating to "any unrelated case being dismissed."

¶13   At the close of the State's case, Sosa-Hurtado moved for a directed verdict on the aggravated murder charge, arguing that there was insufficient evidence to allow the jury to conclude that Sosa-Hurtado knowingly placed someone other than Stephen at a great risk of death when he murdered Stephen. The district court denied the motion. The district court concluded that "there [was] an adequate basis for maintaining the aggravator as it exists under the law," because of the "small area" inside the smoke shop where

Stephen and Isabel were located and "the injury that resulted to Isabel."

¶14 At trial, Sosa-Hurtado admitted that he had, on one occasion, purchased ammunition for an AK-74—the type of gun that allegedly had been used to murder Stephen.[2] On cross-examination, the State sought to establish that Sosa-Hurtado had purchased AK-74 ammunition on four separate occasions, which he denied. The State then produced receipts of ammunition purchases in an attempt to impeach his testimony, claiming that the receipts were discovered in Sosa-Hurtado's home. Sosa-Hurtado's counsel objected to the admission of the receipts, asserting that they had not been found in Sosa-Hurtado's home. The district court sustained the objection. The State apologized to the jury, stating that it had been "incorrect" in asserting that the ammunition receipts had been found in Sosa-Hurtado's home and conceding that the State "[could] not tie those purchases to [the] defendant."

¶15 During the jury's deliberations, the judge met with the jury without counsel present. The judge notified the jury that because it was Election Day, she would need to recess the jury to give them time to vote. The members of the jury indicated that they were close to a verdict and that they would notify the judge if they needed to reconvene the next day. Shortly thereafter, the jury informed the judge that they had reached a verdict. When the court reconvened to receive the jury's verdict, the judge informed the parties of this meeting and confirmed with the jury that she had fairly represented their discussion.

¶16 The jury convicted Sosa-Hurtado of aggravated murder. It also convicted him of felony discharge of a firearm with bodily injury and seven counts of felony discharge of a firearm.

¶17 Sosa-Hurtado filed a timely motion for a new trial along with a supporting memorandum. In the motion, Sosa-Hurtado asserted that his right to a fair trial had been prejudiced by: (1) "The State's misrepresentation of the terms of [Suarez-Campos's] plea bargain"; (2) "Prosecutorial and police misconduct"; and (3) "The

---

[2] The State could not identify precisely the type of rifle used in the homicide, but it narrowed the field to three possibilities, one of which was an AK-74. The State then attempted to connect Sosa-Hurtado to that type of weapon.

court's *ex parte* communication with the jury." For support, the motion for new trial cited portions of the trial transcript.

¶18 The State opposed Sosa-Hurtado's motion, asserting in part that it lacked the evidentiary support required under Utah Rule of Criminal Procedure 24. *See* UTAH R. CRIM. P. 24(b) (2007) ("A motion for a new trial . . . shall be accompanied by affidavits or evidence of the essential facts in support of the motion.").

¶19 Sosa-Hurtado filed a reply. A month later, Sosa-Hurtado filed an amended motion for a new trial. He also filed four affidavits to support his motions. Sosa-Hurtado filed these documents six weeks to four months after rule 24's ten-day filing period had passed. *See id.* 24(c).[3] In response to these filings, the State filed two additional affidavits and requested an evidentiary hearing.

¶20 The district court denied the State's request for an evidentiary hearing, reasoning that it did not need a hearing to decide the motions. The district court denied Sosa-Hurtado's amended motion for a new trial because it was not filed within ten days after entry of sentence as rule 24 required at the time. The district court noted that Sosa-Hurtado did not request or receive an extension of time to file the amended motion.

¶21 The district court also denied Sosa-Hurtado's original motion for a new trial. The court first concluded that "except for references in the memorandum to the trial record, [Sosa-Hurtado] did not provide the required evidence or affidavits in support of his claims" as part of his motion for new trial as required by rule 24(b). Therefore, the court did not consider any of the late-filed affidavits or Sosa-Hurtado's amended motion for new trial and "review[ed] the only evidence available to it, *i.e.*, the trial record, to determine whether any error exist[ed] that substantially prejudiced [Sosa-Hurtado's] rights." In other words, the district court considered only the materials that had been filed within rule 24's ten-day period. The district court then concluded that there was "no error or impropriety that could have had a substantial adverse effect

---

[3] The rule was amended, effective November 1, 2015, to allow a defendant to move for a new trial within fourteen days after sentencing. UTAH R. CRIM. P. 24(c) (2015). We cite to the version of the rule that applied at the time of Sosa-Hurtado's trial.

on" Sosa-Hurtado such that a more favorable outcome would have resulted but for the errors.

¶22   Sosa-Hurtado appealed his convictions to the court of appeals. The court of appeals affirmed, concluding that there was sufficient evidence to support the jury's verdict and that the trial court did not abuse its discretion in denying Sosa-Hurtado's late-filed addenda to his motion for a new trial and in denying the motion. *State v. Sosa-Hurtado*, 2018 UT App 35, ¶ 59, 424 P.3d 948. We granted *certiorari*.

II

¶23   Sosa-Hurtado contends that the court of appeals erred in affirming the trial court's denial of a directed verdict and concluding that the jury was presented with sufficient evidence to support the finding that he "knowingly created a great risk of death to a person other than the victim and the actor." UTAH CODE § 76-5-202(1)(c) (2013).[4] He next asserts that the court of appeals erred in concluding that the district court did not abuse its discretion when it declined to consider late-filed documents and an amended motion for a new trial and in affirming the district court's denial of the motion for a new trial.

¶24   We find each of these arguments unpersuasive. There was sufficient evidence to sustain a verdict of aggravated murder. And the district court acted within its discretion when it refused to consider late-filed documents and when it denied Sosa-Hurtado's motion for a new trial.

A

¶25   A person commits "aggravated murder" under Utah law if he "intentionally or knowingly causes the death of another" under any of a range of "circumstances" described in our code. UTAH CODE § 76-5-202(1). One of the listed circumstances is where "the actor knowingly created a great risk of death to a person other than the victim and the actor." *Id.* § 76-5-202(1)(c).

¶26   A key question in this case concerns the scope of the "circumstances" that may be considered in deciding whether Sosa-Hurtado "knowingly created a great risk of death to a person other than the victim and the actor." *Id.* Our cases have long held that the

---

[4] Because the underlying trial occurred in 2014, we cite to the version of the code in effect at that time.

relevant circumstances extend beyond the precise act that caused the death of the victim. *See, e.g, State v. Pierre*, 572 P.2d 1338, 1355 (Utah 1977). In *Pierre* we said that the statute may be satisfied if the risk was created "within a brief span of time" of the act causing the murder so long as the acts together "formed a concatenating series of events." *Id.* Later, in *State v. Johnson*, we noted that this standard "require[d] clarification" and explained that the statute is met where another person is placed "within the 'zone of danger' created by" the conduct that caused the victim's death. 740 P.2d 1264, 1266–67 (Utah 1987) (citation omitted). In so stating we indicated that the "zone of danger" test may be satisfied even though "the endangered person is physically removed from the defendant's conduct" at the time of the killing. *Id.* at 1267. Yet we emphasized that a determination of whether the statutory standard is met "require[s] a careful consideration of a defendant's intent and knowledge of the risk and the endangered person's proximity in time and place to the murder." *Id.* We explained, in other words, that "[a] proper reading of the statute requires an examination of the manner in which the killing occurred and consideration of whether the knowing and intentional killing took place under circumstances in which the actor knowingly exposed someone other than himself and his victim to a great risk of death because of his knowing or intentional murder of his victim." *Id*. at 1266.

¶27 We uphold the verdict in this case under the standard set forth in *Pierre* and *Johnson*. In so doing we reject an alternative standard proposed by Sosa-Hurtado and endorsed by the dissent—a standard holding that the requirements of Utah Code section 76-5-202(1)(c) are met only where the murderous act itself creates a "great risk of death to a third party."[5] *Infra* ¶ 111. This standard is

---

[5] The dissent seeks to distance itself from the "murderous act" standard advanced by Sosa-Hurtado. Justice Pearce says that he would require only a showing that the great risk of death resulted from specific "acts that were directed at the victim who was killed." *Infra* ¶ 111 n.31. But this still narrows the temporal focus of the statutory inquiry substantially. And it leaves unanswered the question of which acts count as acts "directed at the victim who was killed."

For reasons explained below we conclude that the shots fired at Isabel were connected temporally, spatially, and causally to the murderous acts directed at Stephen. *See infra* ¶¶ 50–52. And on that

(continued . . .)

incompatible with the structure of the statute and has been squarely rejected by our precedent. Consequently, we hold that a person may be guilty of knowingly creating a "great risk of death to a person other than the victim and the actor" if he did so "within a brief span of time" of the act causing the murder and the acts together "formed a concatenating series of events." *Pierre*, 572 P.2d at 1355.

¶28 We also identify considerations that may inform the decision whether a "series of events" is sufficiently connected or related to meet the standard set forth in our cases. Echoing the court of appeals' excellent opinion on this point, we identify a few factors of relevance to the inquiry into whether the acts causing a great risk of death are sufficiently connected to the act of murder. The factors include "(1) the temporal . . . relationship between any actions the defendant may have taken towards the third party and the acts constituting the murder; (2) the spatial relationship . . . between the third party, the murder victim, and the defendant at the time of the acts constituting the murder; and (3) whether and to what extent the third party was actually threatened by the assailant, either by direct threats or by indirect means such as the risk of stray or ricocheting bullets." *State v. Sosa-Hurtado*, 2018 UT App. 35, ¶ 31, 424 P.3d 948.

¶29 Applying these factors, we hold that there was sufficient evidence in this case to sustain a verdict of aggravated murder. The knowing risk was created most obviously when Sosa-Hurtado fired his assault rifle directly at Isabel. That shot created a great risk of death to Isabel. And a reasonable jury could conclude that such a shot was an element of the "circumstances" of the murder of Stephen. Here we have temporal and spatial proximity and an actual threat against Isabel. Sosa-Hurtado fired at Isabel seconds before he shot at Stephen, he shot at Stephen when Isabel was close by, and

---

basis we conclude that Sosa-Hurtado created a great risk of death in the acts he directed at Isabel. In opposing that conclusion, the dissent claims not to be focusing only on the "murderous act itself." But its ultimate conclusion highlights the fact that the only acts that count in the dissent's view are the acts that were directed at Stephen—the murderous acts. There is little, if any, daylight between Sosa-Hurtado's proposed standard and that advanced by the dissent. And neither of them is compatible with the governing statutory scheme as interpreted in our precedent.

there was both an intent to harm or kill Isabel and an act specifically directed at Isabel. We affirm the jury verdict on that basis.

¶30   In the sections below we first assess the language and structure of the operative statute, demonstrating that it is consistent with the standard that we apply and incompatible with the contrary approach proposed by the dissent. Second, we describe and clarify our case law in this field, explaining how it sustains our approach and undermines the standard proposed by the dissent. Third, we conclude by applying the governing legal standard to the facts of this case and explaining the basis for our conclusion that there is sufficient evidence to sustain the jury verdict on the charge of aggravated murder.

1

¶31   The governing statutory scheme is straightforward. It provides that "[c]riminal homicide constitutes aggravated murder if the actor intentionally or knowingly causes the death of another under any of the circumstances" enumerated by statute. UTAH CODE § 76-5-202(1). The listed circumstances include the following: "(a) the homicide was committed by a person who is confined in a jail or other correctional institution"; "(b) the homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons were killed, or during which the actor attempted to kill one or more persons in addition to the victim who was killed"; "(c) the actor knowingly created a great risk of death to a person other than the victim and the actor"; "(d) the homicide was committed incident to an act, scheme, course of conduct, or criminal episode during which the actor committed or attempted to commit aggravated robbery, robbery, rape, rape of a child, object rape, object rape of a child, forcible sodomy, sodomy upon a child, forcible sexual abuse, sexual abuse of a child," or other listed crimes; "(e) the homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which the actor committed the crime of abuse or desecration of a dead human body"; "(f) the homicide was committed for the purpose of avoiding or preventing an arrest of the defendant or another by a peace officer acting under color of legal authority or for the purpose of effecting the defendant's or another's escape from lawful custody"; and "(g) the homicide was committed for pecuniary gain." *Id.*

¶32   A key question presented is the timeframe in which the "circumstances . . . creat[ing] a great risk of death to a person other than the victim and the actor" must arise. *Id.* Sosa-Hurtado has asked

us to interpret the statute to limit the relevant "circumstances" to the specific act that caused the victim's death.

¶33 This limitation does not follow from the structure of the statute. Given differences in statutory language, we agree that the relevant timeframe for assessing the "great risk of death" aggravator is narrower than the timeframe for assessing other statutory aggravators.[6] But it does not follow that the relevant timeframe is *the narrowest one imaginable*—the murderous act itself.

¶34 In fact, the statute's use of the word "circumstances" strongly suggests that such a limitation is inappropriate. Under the statute, a "[c]riminal homicide constitutes aggravated murder if the actor intentionally or knowingly causes the death of another under . . . *circumstances*" in which "the actor knowingly created a great risk of death" to another person. *Id.* (emphasis added). The *circumstances* of a murder are not limited to the final act that specifically causes the victim's death.[7] When we speak of the "circumstances" of an event

---

[6] *Compare* UTAH CODE § 76-5-202(1)(b) (using the modifier "act, scheme, course of conduct, or criminal episode"), *with id.* § 76-5-202(1)(c) (omitting the modifier "act, scheme, course of conduct, or criminal episode" from the "great risk of death" aggravator).

[7] The dissent claims that we are mischaracterizing its position. The "great risk of death" aggravator, it says, is not limited to the "final act that specifically causes the victim's death." Rather, it is limited to the "'manner' by which the defendant kills the victim." *Infra* ¶ 111 n.31. But this is problematic on two levels.

First, by inviting courts to consider the "manner" by which the defendant kills the victim, the dissent introduces the very problem it seeks to address. What constitutes the "manner" of the killing? The dissent says that it is "limited to those acts that were directed at the victim who was killed." *Infra* ¶ 111 n. 31. But the dissent stops short of defining what it means for acts to be "directed at the victim." Acts may be directed at both the victim and a third party. And regardless, a factfinder will have to decide how broadly the relevant "acts" are allowed to sweep. In this sense the standard proffered by the dissent is not much different from the one we endorse. Either one will require some difficult line-drawing.

Perhaps the standard the dissent has in mind is narrower. After all, the dissent vacillates on the relevant conduct to consider, stating

(continued . . .)

11

we are talking about "a specific part, phase, or attribute of the surroundings or background of an event." *See Circumstance*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). And when we speak of the "circumstances" of a "murder" or "homicide," in particular, we are referring to any of various conditions or factors in the setting or surroundings of the criminal act.[8]

---

at one point that we look solely to "the action that constituted the homicide." *Infra* ¶ 101. But if that's the case, then the distinction it draws seems like a distinction without a difference. Regardless of whether we frame the relevant analysis in terms of an examination of the final act that caused the victim's death or of the manner by which the victim was killed, our review would be limited to the action that resulted in the death of the victim. For reasons detailed in this opinion, this framework is incompatible with precedent and with Utah Code section 76-5-202.

[8] The word "circumstances" in section 76-5-202 could also fairly be read to refer to the list of twenty aggravators mentioned in the statute. This is the reading advanced by the dissent. *Infra* ¶ 82 n.18. While this may be a permissible reading of the statute, it's not the only one. The statutory language also supports our reading, which requires an analysis of the circumstances surrounding the homicide.

Importantly, this appears to be the reading endorsed by this court in *Pierre* and *Johnson*. Each case emphasized the importance of considering the "circumstances" surrounding the homicide when interpreting section 76-5-202. *See State v. Johnson*, 740 P.2d 1264, 1266 (Utah 1987) ("Section 76-5-202(1)(c) states that an actor commits first degree murder if he 'knowingly or intentionally causes the death of another' *under circumstances* in which he 'knowingly created a great risk of death to a person other than the victim or the actor.' A proper reading of the statute requires . . . consideration of whether the knowing and intentional killing took place *under circumstances* in which the actor knowingly exposed someone other than himself and his victim to a great risk of death . . . ." (emphasis added)); *State v. Pierre*, 572 P.2d 1338, 1355 (Utah 1977) ("We believe a careful reading of . . . Section 76-5-202(1)(c) requires . . . an intentional and knowing killing of one *in circumstances* where the defendant creates a great risk of death to another other than the victim and the defendant . . . ." (emphasis added)). Thus, the word "circumstances" both provides a strong textual clue about the scope of the aggravator at issue and plays an important role as a matter of *stare decisis*.

(continued . . .)

¶35 For these reasons we find no basis for the conclusion that the statute requires proof that the defendant knowingly caused a "great risk of death" to another person at the precise moment of his murderous act. In fact, the term "circumstances" cuts against this reading.

2

¶36 The statute itself may not prescribe a precise timeframe for the assessment of whether the defendant "knowingly caused a great risk of death" under the "circumstances" of the homicide. Indeed the relevant timeframe may be a matter that eludes a clear, bright line. But our cases have foreclosed the standard advocated by Sosa-Hurtado. We have held that it is enough that the act that caused the great risk of death be one in a "concatenating series of events," *State v. Pierre*, 572 P.2d 1338, 1355 (Utah 1977), leading to the murder. In other words, the act must merely be connected to the murderous act in a way that places the third person within the "zone of danger" at the time of the murder. *State v. Johnson*, 740 P.2d 1264, 1267 (Utah 1987). And we have identified relevant factors for determining whether the "events" are so connected to the murder that they should count as an element of the relevant "circumstances"—factors such as the defendant's intent and the spatial and temporal proximity between the murder and the act causing a great risk of death. *Id.*

¶37 We first announced a standard for the governing timeframe under Utah Code section 76-5-202(1)(c) in *Pierre*. In that case we said

---

The dissent seeks to avoid this latter concern by suggesting that *Johnson* overruled *Pierre sub silentio*. We disagree with this conclusion for reasons discussed below, *see infra* ¶ 41—the most relevant being that *Johnson* itself encourages courts applying the "great risk of death" aggravator to consider whether the killing "took place *under circumstances* in which the actor knowingly exposed someone other than himself and his victim to a great risk of death." *Johnson*, 740 P.2d at 1266 (emphasis added). The dissent seeks to avoid this quoted language by fixating on the first part of the *Johnson* standard, which "requires an examination of the manner in which the killing occurred." *Id.* But when read in full, it is clear that *Johnson* merely clarified what we said in *Pierre*—it did not overturn *Pierre sub silentio*. And that clarified standard comports with the language of section 76-5-202.

that the "great risk of death" aggravator is triggered where the events causing such a risk occurred "within a brief span of time in which were formed a concatenating series of events" surrounding the murder. *Pierre*, 572 P.2d at 1355. In so stating we clearly indicated that the act causing the great risk of death did not have to be the murderous act itself. *See infra* ¶ 90 (conceding that under *Pierre* "the great risk of death to another did not need to be the same act that killed the victims for the aggravator to apply"). Our *Johnson* opinion embraced and extended the underspecified *Pierre* standard. In *Johnson* we noted that we had "previously interpreted" section 76-5-202(1)(c) "to apply when the defendant created a setting in which he placed persons other than the victims at great risk of death 'within a brief span of time in which were formed a concatenating series of events.'" 740 P.2d at 1266 (citing *Pierre*, 572 P.2d at 1355). Yet we acknowledged that "[t]hat standard require[d] clarification to permit a meaningful application of the language of section 76-5-202(1)(c)." *Id.* And we provided clarification.

¶38 In clarifying the standard, we held that "the statute requires an examination of the manner in which the killing occurred and consideration of whether the knowing and intentional killing took place under circumstances in which the actor knowingly exposed someone other than himself and his victim to a great risk of death because of his knowing or intentional murder of his victim." *Id*. We further indicated our agreement with the explanation set forth in *State v. Price*, which provides that the relevant "facts" to be considered "must include a knowing or purposeful state of mind *vis-a-vis* the creation of a great risk of death, that there be a likelihood or high probability of great risk of death created, not just a mere possibility . . . and that there be at least another person within the 'zone of danger' created by defendant's conduct." *Johnson*, 740 P.2d at 1267 (quoting *State v. Price*, 478 A.2d 1249, 1260 (N.J. Super. Ct. Law Div. 1984)). We also noted that "there may be circumstances in which a defendant may be guilty although the endangered person is physically removed from the defendant's conduct" while emphasizing "that such cases require a careful consideration of a defendant's intent and knowledge of the risk and the endangered person's proximity in time and place to the murder." *Id.*

¶39 The standard developed in our case law is in line with that applied by the court of appeals in its decision in this case. In the decision before us on review on *certiorari*, the court of appeals stated that the applicability of the aggravator under section 76-5-202(1)(c) is "often influenced by three main factors: (1) the temporal . . .

relationship between any actions the defendant may have taken towards the third party and the acts constituting the murder; (2) the spatial relationship . . . between the third party, the murder victim, and the defendant at the time of the acts constituting the murder; and (3) whether and to what extent the third party was actually threatened by the assailant, either by direct threats or by indirect means such as the risk of stray or ricocheting bullets." *State v. Sosa-Hurtado*, 2018 UT App 35, ¶ 31, 424 P.3d 948 (citations omitted). The court emphasized that these factors are not exhaustive. *Id.* ¶ 32. And it explained that the ultimate inquiry is whether there was a "great risk of death" to a third person resulting from an act of homicide and "not just a mere possibility."[9] *Id.* ¶ 28 (citation omitted).

---

[9] The dissent raises three objections to our endorsement of these factors. *Infra* ¶¶ 108–110. The first objection stems from the dissent's doubts about the continuing viability of the *Pierre* standard. *Pierre*, however, remains good law. *Johnson* admittedly clarified *Pierre*. But it did not overrule it. The dissent's second concern is that our endorsement of these factors "risks leaving behind the question of whether the defendant 'knowingly created' the great risk of death." *Infra* ¶ 109. We see no basis for this concern. We are not establishing a multifactor balancing test. We are simply identifying a range of factors of possible relevance to the statutory inquiry as elaborated in our case law. The ultimate test is the statutory test. And we emphasize that the statutory test requires that the defendant "knowingly create[]" the great risk of death. UTAH CODE § 76-5-202(1)(c) (2013).

The dissent's final concern is targeted at "multifactor tests" generally—a judicial formulation that has been criticized in a series of our recent opinions. *See, e.g.*, *Met v. State*, 2016 UT 51, ¶¶ 89–90, 388 P.3d 447. We accept and agree with the dissent's concerns on this score. Multifactor tests have the potential "to corrode into a checklist divorced from the legal question at issue." *Infra* ¶ 110. And they can undermine the role of determinacy in the name of flexibility. But we are not here establishing a multifactor test. We are simply identifying considerations of possible relevance to the legal inquiry required by statute and elaborated in our case law. These considerations are non-exhaustive. And they are not the test. Such considerations are important, moreover, as applied to a legal question that does not lend itself easily to a single bright-line rule. *See State v. Rushton*, 2017 UT 21, ¶ 71, 395 P.3d 92 (Lee, A.C.J.,

(continued . . .)

¶40   The court of appeals had it exactly right. The scope of the "great risk of death" timeframe has not been pinpointed in our case law. But we have stated clearly that the risk need not be linked solely to the precise act that caused the murder. And we have identified factors relevant to the inquiry into whether there was a "great risk of death" (and not just a possibility) imposed as a result of the circumstances of the murder. Here, a reasonable jury could easily find that those factors support the conclusion that Sosa-Hurtado caused a great risk of death to Isabel during the murder of Stephen: Sosa-Hurtado fired at Isabel seconds before shooting Stephen, he shot at Stephen when Isabel was close by, and he specifically acted with the intent to harm or kill Isabel. There is sufficient evidence to support the jury's conclusion that Sosa-Hurtado knowingly created a great risk of death to Isabel in the circumstances of the homicide. We affirm the jury verdict on that basis.

¶41   The dissent disagrees based on the conclusion that the "great risk of death" must result from the "action that constituted the homicide"—here, the two deadly shots fired at Stephen. *Infra* ¶ 101. That conclusion is premised on the notion that the standard announced in *Pierre* was overruled "*sub silentio*" in *Johnson*— specifically, that *Johnson* implicitly held that an act in a "series of events was not sufficient . . . to satisfy the section 76-5-202(1)(c) aggravator," but instead required that the precise act that caused the victim's death also caused the great risk of death to another person.

---

concurring in the judgment) (noting that multifactor tests "may have a place in the law—in a field, for example, where precision is untenable (or unimportant) and flexibility is at a premium"); *id.* ¶ 71 n.11 (noting that "[t]here is a rich literature on the virtues and vices of objective rules and subjective standards," that "[n]early everyone agrees that there is a place in the law for both," and that "balancing tests" are most "problematic in fields in which predictability is at a premium"). The governing statute at issue does not prescribe a clear standard. It leaves undefined the relevant "circumstances" courts should consider when applying the "great risk of death" aggravator. And our case law has liquidated this ambiguity by articulating certain factors that courts may consider. These factors are well-established in our law, are compatible with the statutory text, and are sufficiently workable in practice. We thus see no reason to call them into question.

*Infra* ¶ 100. The dissent reaches this conclusion despite some undeniable features of the *Johnson* opinion: (a) the *Johnson* opinion expressly states that it is only *clarifying* the standard in *Pierre*, *Johnson*, 740 P.2d at 1266; (b) in *Johnson* we never came close to stating that a "series of events" is insufficient, and in fact restated the "concatenating series of events" standard favorably, *id.*; (c) *Johnson* emphasized the need to consider the "circumstances" surrounding the murderous act, *id.*; and (d) *Johnson* never says that the "murderous act itself" must create the great risk of death.

¶42 Despite these problems, the dissent insists on a reading of the *Johnson* opinion that attributes to that court an intent to take a 180-degree turn in our law. It bases this reading on inferences it draws from the facts of *Johnson*. Specifically, the dissent notes that in *Johnson* the court's focus was on "whether the act that killed the victim—in that case, the battery [of the husband]—placed the third party [the wife] in a great risk of death." *Infra* ¶ 97. Because our analysis in *Johnson* inquired into whether the battery of the husband (the act that caused his death) created a great risk of death to the wife (who was at the time of the murder physically removed from her husband—in a different part of a building where the two were being held), the dissent insists that *Johnson* was really rejecting the "concatenating series of events" standard and replacing it with a "great risk of harm" from the murderous act itself standard. *See infra* ¶¶ 99–101.

¶43 This is a misread of *Johnson*. The *Johnson* court didn't come close to abandoning the notion that a connected "series of events" could be sufficient to trigger the section 76-5-202(1)(c) aggravator. To the contrary, the *Johnson* court recited and endorsed the "series of events" standard—restating it and expressly clarifying it by identifying factors of relevance to whether acts in a series might trigger the aggravator (despite not being the precise act that caused death). *Johnson*, 740 P.2d at 1267. The *Johnson* court's focus on "whether the 'manner' by which the defendant killed the victim" created a great risk of harm, *infra* ¶ 97, is not an indication of a changed standard. It is merely an application and clarification of the *Pierre* standard to the facts of the case.

¶44 In *Johnson* the court focused on whether the battery of the husband created a great risk of death to the wife not because the murderous act is the only relevant factor under section

76-5-202(1)(c), but because this was the defendant's *only act* that created a great risk of death to another person.[10] In *Johnson* there were no gunshots fired at another immediately before the killing (as in this case). So the court in *Johnson* had no occasion to decide the question we are presented with here—as to whether such gun shots could count as a step in a connected "series." It was only deciding whether the murderous act (the battery of the husband) was an act that created a great risk of death to another. And the standard the court expressly announced is one that both restates the connected "series" holding from *Pierre* and that expressly clarifies it by announcing factors that help tell us when acts in a series are sufficiently connected.

¶45 The *Johnson* opinion indicates that the factors of relevance to the *Pierre* inquiry include the "defendant's intent and knowledge of the risk and the endangered person's proximity in time and place to the murder." *Johnson*, 740 P.2d at 1267. And the ultimate question is whether there was "at least another person within the 'zone of danger' created by [the] defendant's conduct." *Id.* (quoting *Price*, 478 A.2d at 1260). The dissent infers that the relevant "conduct" must be limited to the "action that constituted the homicide." *See infra* ¶¶ 96–

---

[10] Admittedly, in *Johnson* there were other acts directed at the wife that may arguably have been connected to the killing, and that may have caused her great risk of death—the fact that the defendant "attempted to choke her," for example, after he sexually assaulted her (acts that were perpetrated after the defendant had completed his murder of the husband). 740 P.2d at 1266. It does not follow, however, that the *Johnson* court held that these other acts did not count as part of the relevant circumstances of the murder, or that it effectively "narrowed the test . . . announced in *Pierre*." *Infra* ¶ 99 n.25. We interpret the *Johnson* opinion based on the analysis in the *Johnson* opinion. And nothing on the face of the opinion states that these other acts were irrelevant. Clearly *Johnson* does not adopt a new test, or limit the "great risk of death" inquiry to the acts causing a victim's death.

The dissent notes that the above acts were apparently raised in the briefing before this court. *Infra* ¶ 99 n.25. But the *Johnson* opinion nowhere addresses these additional acts. And we therefore see no basis for a reading of *Johnson* that would treat it as having adopted a revised test that focuses only on the defendant's murderous act.

101. But the reference to "conduct" does not answer the question whether it is the murderous act alone that counts or whether other acts in a connected "series" should also count. The term "conduct" is at worst ambiguous as to whether it sweeps to include other acts in a connected series. And the dissent's insistence on the narrow murderous act formulation cannot be reconciled with the terms and conditions of the *Johnson* opinion. The *Johnson* court explicitly noted that "there may be circumstances in which a defendant may be guilty *although the endangered person is physically removed from the defendant's conduct*." 740 P.2d at 1267 (emphasis added). A key factor in evaluating such circumstances, in the *Johnson* court's view, is "the endangered person's *proximity in time and place* to the murder." *Id.* (emphasis added). That clearly indicates that the timeframe is not limited to the precise act that caused the victim's death. It would make no sense to consider the time *proximate* to the murderous act if that act was the only "conduct" we considered for purposes of applying the aggravator. We would simply assess the endangered person's condition at the exact time of the murderous act without any consideration of the person's condition at times *proximate* to that act. And that approach is incompatible with what we said in *Johnson* about the circumstances that inform our analysis.[11]

¶46 Our cases have stated a clear standard. The governing standard is not a bright line, but it is the standard prescribed in our case law. We accordingly retain it, as it is well-established in our cases, is consistent with the statutory text, and is sufficiently workable in practice.

3

¶47 We also conclude that there was a sufficient basis for a guilty verdict on the charge of aggravated murder under the

---

[11] The dissent's standard would also yield some real practical difficulties. If the dissent's standard were taken to its logical end, a defendant could avoid the application of the aggravator in Utah Code section 76-5-202(1)(c) despite taking multiple shots at both his eventual victim and another person positioned closely nearby. He could even seriously wound both persons. So long as the final kill shot is taken after the two people separate, the dissent would mandate the conclusion that there is no "great risk of death" to another person resulting from the circumstances of the murder. That is not our law.

governing standard. Sosa-Hurtado perpetrated two separate acts that created a great risk of death to Isabel and that were part of a "concatenating series of events" leading to the murder of Stephen. The first was the shot directed at (and injuring) Isabel. The second was the initial shot aimed at Stephen—a shot that hit him in the hand when Isabel was only a few feet away. A reasonable jury could conclude that both of these acts created a great risk of death to Isabel and that both were part of the "concatenating series of events" leading to the murder of Stephen.

¶48   A *concatenating* series of events is a series that is "linked" together in a meaningful way. *See Concatenate*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (defining "concatenate" as "to link together"). The link between the acts in a "series" of events leading to a murder may be established based on the "defendant's intent and knowledge of the risk and the endangered person's proximity in time and place to the murder." *State v. Johnson*, 740 P.2d 1264, 1267 (Utah 1987). And here both the defendant's state of mind and Isabel's close proximity in time and place to the murder of Stephen sustain a close linkage between these events. *See State v. Sosa-Hurtado*, 2018 UT App 35, ¶ 31, 424 P.3d 948 (identifying temporal relationship, spatial relationship, and threat to the third party as factors relevant to the inquiry called for by our cases).

¶49   Sosa-Hurtado's intent and knowledge are evident. He was defeated[12] in a fistfight with Stephen and soon came back with an assault rifle to seek revenge. When he saw that Isabel was in the way, Sosa-Hurtado shot at him directly. That shot alone is powerful evidence of Sosa-Hurtado's state of mind toward Isabel. Sosa-Hurtado had more than mere knowledge that he was creating a great risk of death to Isabel. He intended to create that risk—or perhaps even to kill him. That is a powerful indicator of the connection between the shots aimed at Stephen and the initial shot aimed at Isabel. And it thus provides strong support for the jury verdict of aggravated murder.

---

[12] There is no direct evidence indicating that Stephen *defeated* Sosa-Hurtado in a fistfight. But there is circumstantial evidence to this effect—evidence that Stephen punched Sosa-Hurtado twice in the face, and that Sosa-Hurtado responded by speeding away in his car. A reasonable jury could infer that Sosa-Hurtado's response was a reaction to being bested by Stephen in the fistfight.

¶50   The jury could properly have concluded that there was a close causal connection between the shot aimed at Isabel and the shots that killed Stephen. The evidence could reasonably sustain the conclusion that Sosa-Hurtado shot at Isabel to get him out of the way—so he could proceed with the job of avenging his earlier defeat at the hands of Stephen. Under this view of the evidence, it could be said that "the knowing and intentional killing took place under circumstances in which the actor knowingly exposed someone other than himself and his victim to a great risk of death *because of* his knowing or intentional murder of his victim." *Johnson*, 740 P.2d at 1266 (emphasis added). And this further sustains the conclusion that the danger intentionally caused to Isabel was an element of the "circumstances" leading to the murder of Isabel.

¶51   This is also reinforced by the "close proximity in time and place" between the killing and the shot fired at Isabel. The record does not tell us precisely how much time elapsed between the kill shots fired at Stephen and the initial shot fired at Isabel, but it seems clear that it was only a matter of seconds.[13] That also reinforces the above-noted linkage between the two sets of shootings. Again, the jury could properly have concluded that Sosa-Hurtado's shot at Isabel was aimed at furthering his ultimate goal of a revenge-killing of Stephen. And the temporal proximity of the two shootings reinforces that conclusion.

¶52   The same goes for the spatial proximity of the shootings. All of the shootings took place within the same small smoke shop— just twenty-four feet by fifteen feet. Thus Sosa-Hurtado could not have been more than a couple of feet away from where he shot at Isabel when he turned to take the execution shots at Stephen. This again confirms that the killing and the initial shot at Isabel were part of a series of "concatenating events" under our cases, or in other words that Isabel was within the "zone of danger" when Sosa-Hurtado killed Stephen. And we uphold Sosa-Hurtado's conviction on this basis.

B

¶53   Sosa-Hurtado next asserts that the court of appeals erred in upholding the trial court's refusal to consider the documents he filed months after submitting his motion for a new trial. Sosa-Hurtado

---

[13] Isabel's testimony at trial indicates that Sosa-Hurtado fired at Stephen immediately after firing at Isabel.

views this as "effectively denying [his] motion for new trial on unnecessarily technical grounds."

¶54 Sosa-Hurtado claims that rule 24 of the Utah Rules of Criminal Procedure does not require a party to request leave to file evidence after the ten-day filing period has passed unless it would delay a hearing or inconvenience the court. *See* UTAH R. CRIM. P. 24 (2007). Sosa-Hurtado also asserts that the court of appeals erred in affirming the trial court's denial of the motion on the merits. We disagree on all counts and affirm.

1

¶55 Sosa-Hurtado contends that rule 24 did not require him to request leave of the court to file affidavits six weeks to four months after he filed his initial motion. Because "no hearing ha[d] been scheduled," he insists that "no leave would be necessary as no delay would be occasioned thereby." The State sees the matter differently. It interprets the rule 24 deadline to file a motion for new trial within ten days after entry of sentence to also apply to the supporting affidavits and documentation. And, if a defendant cannot meet this deadline, the State says the defendant may move for an extension "before expiration of the time for filing a motion for new trial." *See* UTAH R. CRIM. P. 24(c) (2007).

¶56 The arguments distill down to a question of what Utah Rule of Criminal Procedure 24 requires. Rule 24 states:

> (a) The court may, upon motion of a party or upon its own initiative, grant a new trial in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party.
>
> (b) A motion for a new trial shall be made in writing and upon notice. The motion shall be accompanied by affidavits or evidence of the essential facts in support of the motion. If additional time is required to procure affidavits or evidence the court may postpone the hearing on the motion for such time as it deems reasonable.
>
> (c) A motion for a new trial shall be made not later than 10 days after entry of the sentence, or within such further time as the court may fix before expiration of the time for filing a motion for new trial.
>
> (d) If a new trial is granted, the party shall be in the same position as if no trial had been held and the

> former verdict shall not be used or mentioned either in
> evidence or in argument.

UTAH R. CRIM. P. 24 (2007).

¶57 Accordingly, at the time of Sosa-Hurtado's trial, rule 24 gave a defendant ten days following sentencing to file a motion for new trial. *Id.* 24(c). Rule 24 also states that a motion "shall be accompanied by affidavits or evidence of the essential facts in support of the motion." *Id.* 24(b). Supporting evidence of essential facts must thus accompany the motion and must be filed within the ten days as required by rule 24, unless the trial court extends the ten-day period. *Id.* 24(c); *see State v. Mitchell*, 2007 UT App 216, ¶ 9, 163 P.3d 737. If a party desires an extension to file a motion or supporting evidence, it must seek leave of the court within the ten-day filing period. *Mitchell*, 2007 UT App 216, ¶¶ 9–12 (reasoning that rule 24 "provides a clear method by which a defendant may invoke the discretion of the trial court to obtain more time to file a properly supported motion."). Although rule 24(c) does not explicitly state the parties must ask for leave, its language implies that a party must ask for leave within the ten-day window before submitting evidentiary support after the filing deadline has passed. UTAH R. CRIM. P. 24(a), (c) (2007).

¶58 The court of appeals held that Sosa-Hurtado could not file supporting documentation after the ten-day filing period unless he filed a request for an extension within that period. *State v. Sosa-Hurtado*, 2018 UT App 35, ¶¶ 41–42, 424 P.3d 948 (citing *Mitchell*, 2007 UT App 216). It also concluded that the decision to grant or deny a request for an extension is a matter "entirely within the trial court's discretion." *Id.* ¶ 41. We agree. The district court could permissibly have allowed the submission of the late-filed documents. But it also had the discretion to refuse to consider this new material.[14] Because Sosa-Hurtado failed to ask for an extension

---

[14] Sosa-Hurtado also contends that the district court should have held an evidentiary hearing (with the subtext that he might have been able to discuss his late-filed evidence at the hearing). In his briefing on appeal, he frames this argument as the "Consequences of Refusal to Consider After-Filed Documents and Hold an Evidentiary Hearing." We would frame this differently. We see it as the consequence of defense counsel's failure to file the supporting documentation in the time required by the rules of criminal

(continued . . .)

within the ten-day filing period, the trial court was within its discretion in refusing to consider the late-filed documents.[15] *Id.* ¶ 42.

¶59 Sosa-Hurtado also contends that the trial court's conclusion that he "did not provide the required evidence or affidavits in support of his claim" is a "hyper-technical" reading of rule 24 because he contends that he incorporated the evidence by reference. And he contends that the court of appeals' decision to uphold this conclusion was error. *See Sosa-Hurtado*, 2018 UT App 35, ¶¶ 39–44.

¶60 Sosa-Hurtado asserts that the motion provided "evidence of the essential facts in support of the motion, and constituted substantial compliance with [r]ule 24." But this argument misunderstands the basis for the court of appeals' decision. The court of appeals focused its analysis on whether the trial court acted

---

procedure. We also note that the decision to grant or deny an evidentiary hearing is firmly committed to the district court's discretion. *See State v. Wilder*, 2016 UT App 210, ¶ 15, 387 P.3d 512 (reasoning that "[a]ssuming the defendant presents some evidence, the trial court may choose to hold an evidentiary hearing before ruling on the motion for new trial."). And we see nothing to suggest that the district court abused its discretion in proceeding on the papers in front of it, given that both parties relied on the trial transcript and on the basis of that transcript, no material fact was in dispute. *See State v. Clegg*, 2002 UT App 279, ¶ 6, 54 P.3d 653 ("If no material fact is in dispute, then no evidentiary hearing is required.").

[15] Sosa-Hurtado notes that our rules of criminal procedure are "intended and shall be construed to secure simplicity in procedure, fairness in administration, and the elimination of unnecessary expense and delay." UTAH R. CRIM. P. 1 (2007). And he insists that these goals should have directed the admission of his late-filed documents. We disagree. The quoted principles are background goals to be taken into account in the interpretation of our rules of procedure. But the stated goals do not trump the terms and conditions of the rules, or the inherent discretion vested in our trial judges. Where, as here, the trial judge has the discretion to reject a late-filed document, the broad aspiration for "fairness" is hardly a basis for overriding the court's discretion. Fairness often dictates adherence to the timeframes set forth in our rules. And those timeframes cannot be overridden by a bare citation to the general aspiration for "fairness."

within its discretion when it elected to exclude the late-filed affidavits and amended motion. *Sosa-Hurtado*, 2018 UT App 35, ¶¶ 39–44. As discussed above, the court of appeals properly concluded that the trial court acted within its discretion when it excluded the late-filed documents.

2

¶61 Sosa-Hurtado also argues that the court of appeals erred by affirming the trial court's denial of the motion for new trial on its merits.[16] Sosa-Hurtado sought a new trial on the basis of three alleged errors: (1) the State violated his constitutional rights by failing to disclose the details of the plea agreement with Suarez-Campos, (2) the State prejudiced Sosa-Hurtado's case by presenting the four doctored ammunition receipts, and (3) the district court's *ex parte* communication with the jury prejudiced him. We affirm the court of appeals' conclusion that none of these alleged errors entitle Sosa-Hurtado to a new trial. *See State v. Sosa-Hurtado*, 2018 UT App 35, ¶ 45, 424 P.3d 948.

¶62 First, because the trial court did not consider the late-filed documents, Sosa-Hurtado asserts that it erred in concluding that the State did not misrepresent its plea deal with Suarez-Campos. At trial, Sosa-Hurtado's counsel asked Suarez-Campos about a pending aggravated burglary charge and suggested that charge would be dismissed under his plea deal. During a sidebar conversation, the State represented to the district court that the dismissal of the aggravated burglary charge required Suarez-Campos "to testify, if necessary, against [Sosa-Hurtado] in that particular case." Sosa-Hurtado's counsel stated that Suarez-Campos's counsel had informed him that the aggravated burglary charge would be

---

[16] Sosa-Hurtado's briefing is unclear on this point. He presents these arguments as "[c]onsequences of [the trial court's r]efusal to [c]onsider [a]fter-[f]iled [d]ocuments and [h]old an [e]videntiary [h]earing." And in his reply brief, he points to these arguments as establishing that he was prejudiced by the trial court's refusal to consider the late-filed documents. Sosa-Hurtado's briefing on appeal to this court therefore appears to present these arguments as evidence of "prejudice" that he experienced as a result of the trial court's alleged error, but not as arguments challenging the denial of the motion for new trial on its merits. Still, out of an abundance of caution, we address them on their merits.

dismissed in exchange for his testimony in this case alone. The State reiterated that the plea deal with Suarez-Campos included his agreement to testify in the aggravated burglary case.

¶63 In the motion for new trial, Sosa-Hurtado asserted that after Suarez-Campos finished testifying, Suarez-Campos's counsel "approached . . . Sosa-Hurtado's counsel and insisted that dismissal of Suarez-Campos' aggravated burglary case was in fact part of his deal to testify against Mr. Sosa-Hurtado." Sosa-Hurtado later filed an affidavit in which his trial counsel attested to this conversation. Sosa-Hurtado also cited to the record of Suarez-Campos's aggravated burglary case in the motion for new trial to demonstrate that the State did dismiss that case after Suarez-Campos gave testimony in this trial. Sosa-Hurtado contrasts this with the State's representation during trial that Suarez-Campos's plea agreement required him to agree to testify against Sosa-Hurtado in the aggravated burglary trial. Sosa-Hurtado asserts that this alleged misrepresentation constitutes a potential *Brady* violation, a *Giglio* violation, and that it denied him "due process and the right of confrontation." *See Davis v. Alaska*, 415 U.S. 308, 315 (1974); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *State v. Gonzales*, 2005 UT 72, ¶ 47, 125 P.3d 878; *State v. Bisner*, 2001 UT 99, ¶ 33, 37 P.3d 1073.

¶64 Without considering the late-filed documents, the court of appeals found unpersuasive Sosa-Hurtado's assertion that he was entitled to a new trial because the State failed to fully disclose the plea deal with Suarez-Campos. *Sosa-Hurtado*, 2018 UT App 35, ¶¶ 46–51. First, the court of appeals concluded that even if the State intended to dismiss the aggravated burglary charge based on Suarez-Campos's testimony in this matter alone and that the State improperly failed to disclose this, he was not entitled to relief because Sosa-Hurtado knew of these terms from Suarez-Campos's counsel. *Id.* ¶ 48 (citing *State v. Pinder*, 2005 UT 15, ¶ 25, 114 P.3d 551). Second, the court of appeals concluded that Sosa-Hurtado had failed to demonstrate prejudice as a result of the State's alleged suppression of information about the plea deal. *Id.* ¶ 49. The jury was already aware that Suarez-Campos was receiving a favorable plea deal for his testimony and Sosa-Hurtado failed to demonstrate that the jury's assessment of Suarez-Campos's credibility would have been materially altered by the notion that an additional charge would have been dismissed in exchange for Suarez-Campos's testimony. *Id.* (citing *State v. Howell*, 2016 UT App 90, ¶ 14, 374 P.3d 1032). For these reasons, among others, the court of appeals held that

Sosa-Hurtado was not entitled to a new trial. *Id.* ¶ 50 (citing *Bisner,* 2001 UT 99, ¶ 33).

¶65   We agree with the court of appeals. As an initial matter, the district court did not abuse its discretion in refusing to admit the affidavits that would have put this information into the record. And even if the district court had accepted the late filings, the district court would not have erred in denying the motion for a new trial. Prosecutors must disclose to defendants all exculpatory evidence in their possession. *Bisner,* 2001 UT 99, ¶ 32; *see also Brady v. Maryland*, 373 U.S. 83, 87 (1963). But "courts universally refuse to overturn convictions where the evidence at issue is known to the defense prior to or during trial, where the defendant reasonably should have known of the evidence, or where the defense had the opportunity to use the evidence to its advantage during trial but failed to do so." *Bisner*, 2001 UT 99, ¶ 33.

¶66   Here it is apparent that defense counsel was aware of the existence of the plea agreement. *Sosa-Hurtado*, 2018 UT App 35, ¶ 48. The State may have failed to disclose the full terms of the deal. But Sosa-Hurtado did not show that he sustained any prejudice from that failure. *See Pinder*, 2005 UT 15, ¶ 24 ("[A] *Brady* violation occurs only where the state suppresses information that . . . is material and exculpatory, meaning its disclosure would have created a reasonable probability that the result of the proceeding would have been different." (internal quotation marks and citation omitted)). Sosa-Hurtado asserts that the jury needed additional information about the plea agreement in light of its potential impact on their assessment of Suarez-Campos's credibility. But he fails to explain how the jury's knowledge of the additional charge would have changed the jury's perception of Suarez-Campos. The jury knew enough about the plea agreement to infer Suarez-Campos's willingness to point a finger at Sosa-Hurtado.

¶67   Sosa-Hurtado next asserts that the court of appeals erred in upholding the district court's refusal to hold a hearing with regard to the falsified receipts. He claims that the State committed prosecutorial misconduct when it presented the receipts.

¶68   On cross-examination, the State sought to impeach Sosa-Hurtado's assertion that he had only purchased AK-74 ammunition one time. To do so, the State attempted to introduce receipts that it initially claimed had been found during a search of Sosa-Hurtado's home. Sosa-Hurtado's counsel objected, claiming that the receipts did not appear to have been found in Sosa-Hurtado's home, but had been faxed from a gun store. The

prosecutor explained that law enforcement represented to him that the receipts were found in Sosa-Hurtado's home during the search but offered to stop short of seeking admission of the exhibits. Sosa-Hurtado requested an admission that the State erred and that the receipts were not found at Sosa-Hurtado's home. Later, after a detective was called to confirm where the receipts had been found, the court sustained Sosa-Hurtado's objection and the State apologized to the jury—with the prosecutor conceding that the State "was incorrect" in asserting that "the receipts for the ammunition . . . w[ere] found in the defendant's home during the search warrant" and conceding that it could not "tie those purchases to this defendant."

¶69 After the deadline for filing a motion for a new trial, Sosa-Hurtado filed two affidavits relevant to this issue. In one affidavit, Sosa-Hurtado's trial counsel attested to overhearing an off-the-record conversation amongst counsel for the State about whether they could determine whether the receipts were found in the search of the home. Sosa-Hurtado's counsel asserted that he heard counsel for the State say that he had whited out words on the receipts that indicated that the receipts were faxed to the detective. He then alleged that he overheard different counsel for the State ask the detective whether he had "any way of tying these receipts to this particular case" and heard the detective admit that he did not. In a separate affidavit another of Sosa-Hurtado's attorneys stated that a member of the trial attorney team located photocopies of the receipts that indicated that they were sent to the detective as a fax.

¶70 Sosa-Hurtado asserts that he was prejudiced by this allegedly doctored evidence and that it "gave the jury reason to doubt his credibility." He contends that the detective's actions amounted to "outrageous conduct shocking the conscience, fundamentally repugnant, and a violation of due process." *See State v. Colonna,* 766 P.2d 1062, 1066 (Utah 1988). And he claims that the trial court should have held an evidentiary hearing to "determine whether the State's conduct amounted to such outrageous conduct as would warrant granting the defendant a new trial." *Id.* at 40. In Sosa-Hurtado's view, "[t]he proper remedy is to remand this case for the purpose of holding a hearing to determine if the Information should be dismissed." *Id.* And, "at the very least," he contends that a new trial "would be warranted for the outrageous violation of [his] due process rights." *Id.* Above all, he seeks remand for a hearing on this issue.

¶71 If these allegations are accurate, then we can certainly understand the outrage. Yet we ultimately agree with the court of appeals that Sosa-Hurtado received all of the relief that he sought during trial. The challenged "evidence was excluded . . . and the State apologized to the jury for its introduction."[17] *Sosa-Hurtado*, 2018 UT App 35, ¶ 52. With that in mind, we agree with the court of appeals that the trial court did not abuse its discretion in denying Sosa-Hurtado's motion for new trial.

¶72 Sosa-Hurtado lastly contends that the court of appeals erred in upholding the trial court's refusal to hold a hearing on the judge's *ex parte* communication with the jury about the need to release jurors to allow them to vote on Election Day. In a cursory argument, Sosa-Hurtado seeks a hearing to determine whether the judge's *ex parte* communication was prejudicial.

¶73 The court of appeals cited *State v. Maestas*, 2012 UT 46, ¶¶ 69–70, 299 P.3d 892, for the proposition that courts do not presume prejudice when an *ex parte* communication with a jury is brief, non-substantive, deals with the timing of the jury's dismissal, is disclosed to both parties, and neither party raised an objection. *Sosa-Hurtado*, 2018 UT App 35, ¶ 54. Because that was the case here, the court of appeals concluded that the trial court acted within its discretion when it did not presume prejudice and declined to grant Sosa-Hurtado a new trial. *Id.* And again we agree. The district court acted within its discretion when it denied the hearing.

III

¶74 We commend the court of appeals for its careful and insightful analysis in this case. We affirm the court of appeals in all respects.

———————————

[17] The court of appeals also noted that Sosa-Hurtado did not submit any timely-filed evidence in support of his claim that the State doctored the receipts to implicate Sosa-Hurtado and refused to consider the affidavits discussed above. *Sosa-Hurtado*, 2018 UT App 35, ¶ 52.

JUSTICE PEARCE, dissenting opinion:

¶75   I dissent from the majority's decision to affirm Sosa-Hurtado's aggravated murder conviction. I concur with the majority's holding that the district court acted within its discretion when it denied the motion for a new trial.

¶76   Sosa-Hurtado contends that the court of appeals erred in concluding that his "shooting at [Isabel], followed by the separate and independent act of shooting [Stephen], supports the aggravating factor." *See State v. Sosa-Hurtado*, 2018 UT App 35, ¶¶ 33–37, 424 P.3d 948. Sosa-Hurtado argues that "it cannot reasonably be said that . . . [he] 'created a likelihood or high probability of great risk of death' to [Isabel] at the specific time he shot and killed [Stephen]."

¶77   Two questions are folded into this issue. First, the meaning of the "great risk of death" aggravator found in Utah Code section 76-5-202(1)(c) (2013). And second, whether the court of appeals correctly concluded that there was sufficient evidence in the record to support the trial court's decision to instruct the jury on that aggravator.

¶78   "Criminal homicide constitutes aggravated murder if," among other things, "the actor intentionally or knowingly causes the death of another" under circumstances in which the actor "knowingly created a great risk of death to a person other than the victim and the actor." UTAH CODE § 76-5-202(1)(c) (2013). Although seemingly straightforward, uncertainty arises in application because the statute does not fully explain the time frame in which the defendant must create the "great risk of death" to another. The statute tells us that it must occur at the time the defendant "causes the death of another," but that still requires us to identify at what point a defendant begins to cause the death of another.

¶79   This case provides a poignant example of the principle. Did Sosa-Hurtado cause Stephen's death when he entered the store armed and ready to kill? Did he cause Stephen's death when he fired at Isabel? When he fired the shot that hit Stephen in the hand? Or when he fired point-blank the two shots into Stephen's chest?

¶80   The meaning of Utah Code section 76-5-202(1)(c) is a question of statutory interpretation. The point of statutory interpretation is to understand what the Legislature intended. *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000. Because "[t]he best evidence of the legislature's intent is the plain language of the statute itself, we look first to the plain language of the statute." *Id.* (alteration in original) (citation omitted) (internal quotation marks

omitted). As we examine the text, "[w]e presume that the legislature used each word advisedly." *Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 2011 UT 54, ¶ 21, 266 P.3d 751 (citation omitted) (internal quotation marks omitted).

¶81 When we find ourselves hunting for language that we do not encounter in the statute's text, we often presume that "the expression of one [term] should be interpreted as the exclusion of another." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (alteration in original) (citation omitted) (internal quotation marks omitted). And we "seek to give effect to omissions in statutory language by presuming all omissions to be purposeful." *Id.*

¶82 "[W]e do not view individual words and subsections in isolation; instead, our statutory interpretation requires that each part or section be construed in connection with every other part or section so as to produce a harmonious whole." *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 15, 301 P.3d 984 (emphasis omitted) (citation omitted) (internal quotation marks omitted). "Thus, we interpret [] statutes to give meaning to all parts, and avoid[] rendering portions of the statute superfluous." *Id.* (alterations in original) (citation omitted) (internal quotation marks omitted). Utah Code section 76-5-202 lists twenty circumstances[18] that change murder into aggravated murder. Section 76-5-202(1)(c) details the "great risk of death" aggravator:

> (1) Criminal homicide constitutes aggravated murder if the actor intentionally or knowingly causes the death of another under any of the following circumstances:
> . . .
>> (c) the actor knowingly created a great risk of death to a person other than the victim and the actor . . . .

---

[18] The majority finds significance in the Legislature's use of the word "circumstance[]" and argues that this is a "strong textual clue" for the "great risk of death" aggravator. *Supra* ¶ 34 n.8. Section 76-5-202(1) provides that criminal homicide constitutes aggravated murder in "any of the following circumstances." Thus the Legislature uses "circumstance[]" to refer to the twenty aggravators and not as a "strong" signal as to how any individual aggravator should be interpreted.

¶83   And it is helpful to read the aggravator in context, taking into account several of the other aggravators the Legislature has specified:

> (1) Criminal homicide constitutes aggravated murder if the actor intentionally or knowingly causes the death of another under any of the following circumstances:
>
>> (a)  the homicide was committed by a person who is confined in a jail or other correctional institution;
>>
>> (b)  the homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons were killed, or during which the actor attempted to kill one or more persons in addition to the victim who was killed;
>>
>> (c)  the actor knowingly created a great risk of death to a person other than the victim and the actor;
>>
>> (d)  the homicide was committed incident to an act, scheme, course of conduct, or criminal episode during which the actor committed or attempted to commit [a specified offense, such as arson, burglary, robbery, or rape];
>>
>> (e)  the homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which the actor committed the crime of abuse or desecration of a dead human body . . . ;
>>
>> (f)   the homicide was committed for the purpose of avoiding or preventing an arrest of the defendant or another by a peace officer . . . or . . . effecting the defendant's or another's escape from lawful custody; [and]
>>
>> (g)  the homicide was committed for pecuniary gain . . . .
>
> (2) Criminal homicide constitutes aggravated murder if the actor, with reckless indifference to human life, causes the death of another incident to an act, scheme, course of conduct, or criminal episode during which the actor is a major participant in the commission or attempted commission of [a specified offense against a child].

UTAH CODE § 76-5-202.

¶84   Read as a whole, the first observation that jumps from the page instructs that many of the aggravating circumstances require that the factor occur as part of the same "act, scheme, course of conduct, or criminal episode" as the murder. *See, e.g.*, *id.* § 76-5-202(1)(b), (d), (e); -202(2). So, for example, if the murder occurs in a scheme or course of conduct that also involves robbery or the desecration of a corpse, it constitutes aggravated murder. *See id.* § 76-5-202(1)(d), (e). And the phrase "act, scheme, course of conduct, or criminal episode" suggests that the time frame encompassed by those aggravators is broader compared to those aggravators where this language is absent.[19]

---

[19] Our case law recognizes that the Legislature's addition of the phrase "one act, scheme, course of conduct, or criminal episode" broadened the relevant time frame for determining whether an aggravator occurred. In *State v. Valdez*, for example, this court reasoned that sufficient evidence supported the aggravator that the two victims were killed "at the same time," because "[w]hile the evidence does not indicate that [the two victims] were killed at the same moment, the jury could have found that they were killed at about the same time and as part of the same episode or scheme." 748 P.2d 1050, 1054 (Utah 1987). We pointed out that when section 76-5-202(1)(b) was rewritten in 1983 to "clarify the scope of the aggravating circumstance," *id.*, the language changed from "[a]t the time the homicide was committed the actor also committed another homicide" to "[t]he homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons are killed." I 1983 Utah Laws 434. Based on this change to the statutory language, we reasoned that homicides that occurred during a longer time frame, instead of at the same time, could satisfy the aggravating factor. *Valdez*, 748 P.2d at 1054.

In *State v. Alvarez*, we again interpreted this aggravating factor and examined whether there was sufficient evidence that the homicide was committed incident to an act, scheme, course of conduct, or criminal episode during which two or more persons were killed. 872 P.2d 450, 458–59 (Utah 1994). We concluded that, under section 76-5-202(1)(b), homicides committed minutes apart were sufficiently close in time to satisfy the aggravator. *Id.* at 459. Thus, we construed section 76-5-202(1)(b) as requiring the jury to

(continued . . .)

¶85 The great risk of death aggravator does not contain the "act, scheme, course of conduct, or criminal episode" modifier. *See id.* § 76-5-202(1)(c). We presume this omission to be deliberate, *see State v. Stewart*, 2018 UT 24, ¶ 13, 438 P.3d 515, and it suggests that the temporal window between the aggravating circumstance and the criminal homicide is narrower for the great risk of death aggravator than it is for those aggravators in which the Legislature has mandated that we look to the entire criminal episode.

¶86 On two prior occasions, we have wrestled with the scope of the great risk of death aggravator. Our first occasion to do so arose out of the infamous Hi-Fi Murders. *See State v. Pierre*, 572 P.2d 1338, 1355 (Utah 1977).

¶87 Pierre and two co-defendants robbed five individuals inside the Hi-Fi Shop. *Id.* at 1343. During the robbery, Pierre and one co-defendant tortured and attempted to kill five individuals, eventually killing three. *Id.* The two men "tied up [the victims], made [them] . . . lie on the floor, and forced [them] to drink liquid Drano." *Id.* Pierre then raped one of the victims. *Id.* After this torture, Pierre "finally shot all of the victims in the head with . . . a . . . handgun, which caused the deaths [of three of the victims], within a brief period of time." *Id.* Pierre then attacked one of the victims further after shooting him: he "kicked a ball point pen into one of [the victim's] ears and attempted to strangle him with a cord." *Id.* at 1344 (footnote omitted).

¶88 On appeal, Pierre argued, among other things, that the trial court misinstructed the jury on the great risk of death aggravator. *Id.*

---

conclude, in part, that "the conduct giving rise to the deaths of [both victims] was closely related in time." *Id.*

Our analyses in *Valdez* and *Alvarez* indicate that the added language "act, scheme, course of conduct, or criminal episode" broadened the time frame during which two homicides need to occur to satisfy the aggravating factor in subsection (1)(b). *See also State v. Schroyer*, 2002 UT 26, ¶ 15, 44 P.3d 730 (citing *Valdez* and *Alvarez* and noting that while the court would not reach the merits of the issue, there was "clearly" a sufficiently close temporal connection to satisfy section 76-5-202(1)(b), where the murder and attempted murder occurred within five to ten minutes of each other).

at 1354-55; *see also* UTAH CODE § 76-5-202(1)(c) (1973).[20] Pierre argued that "the evidence did not disclose any circumstances which would warrant the conclusion that at the time the death of any of the victims was caused either [of the two surviving victims] w[ere] placed in a great risk of death." *Pierre*, 572 P.2d at 1355.

¶89   We disagreed, holding that "[t]he evidence fully sustains that the killing of the three victims and the creation of a setting of great risk of death to the two surviving victims occurred within a brief span of time in which were formed a concatenating series of events." *Id.*[21] We also quoted the trial court's recitation of the State's allegations that the surviving victims had been "poisoned, shot and [one of them] strangled and wounded with a pen and that such acts created a great risk of death to each of them. If it is true as to either of them, it would make the murder of [the other victims] murder in the first degree." *Id.* at 1355 n.28.

¶90   The *Pierre* court concluded that a "careful reading" of section 76-5-202(1)(c) requires "an intentional and knowing killing of one in circumstances where the defendant creates a great risk of death to another other than the victim and the defendant." *Id.* at 1355.[22] By reasoning in this manner, the *Pierre* court concluded that

---

[20]  At trial, the court instructed the jury on six aggravators, which we summarized as follows:

> (1) At the time of killing one, defendant killed another,
> (2) At the time of killing one, defendant intentionally created a great risk of death to others than the victim and himself, (3) The killing was in the perpetration of a robbery, (4) The killing was in perpetration of a rape, (5) The killing was for pecuniary gain, and/or (6) The killing was for personal gain.

*State v. Pierre*, 572 P.2d 1338, 1354–55 (Utah 1977) (footnotes omitted). On appeal, Pierre challenged only the "great risk of death" and "pecuniary gain" aggravators. *Id.* at 1354–55.

[21]  Merriam-Webster defines "concatenate" as "linked together" or "forming a chain or series." *Concatenate*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2nd ed. 1934). Sesquipedalian legal tests are often more problematic than helpful.

[22]  To reach this conclusion, the court determined that section 76-5-202(1)(c) was distinguishable from a prior similar statute: section 76-30-3, which was repealed in 1973. *Pierre*, 572 P.2d at 1355. Utah

(continued . . .)

the act that created the great risk of death to another did not need to be the same act that killed the victims for the aggravator to apply. *See id.*

¶91 We next visited the meaning of "great risk of death" in *State v. Johnson*, 740 P.2d 1264 (Utah 1987). As did the defendant in *Pierre*, Johnson challenged whether there was sufficient evidence to conclude that he had put a third person at great risk of death when he murdered his victim. *Id.* at 1266; *see* UTAH CODE § 76-5-202(1)(c) (Supp. 1986). Johnson also challenged the district court's conclusion that there was sufficient evidence to convict him of the aggravator under section 76-5-202(1)(d), "the homicide was committed while the actor was engaged in the commission of or an attempt to commit . . . aggravated sexual assault." *Johnson*, 740 P.2d at 1266 (alteration in original) (quoting UTAH CODE § 76-5-202(1)(d) (Supp. 1986)).

¶92 Johnson befriended a traveling husband and wife and led them to an abandoned warehouse to spend the night. *Id.* at 1265. At the end of an evening of drinking and playing cards, Johnson suddenly "became unglued," grabbed a shovel handle, and ordered the husband to get up and strip. *Id.* The husband complied but asked Johnson what he was doing. *Id.* Johnson then hit the husband across the shoulders with the shovel, which caused him to fall to his knees. *Id.* When the husband again asked what Johnson was doing, Johnson told him to "[s]hut up, because if you don't I'm going to start on your old lady." *Id.* at 1265–66.

¶93 Johnson "then took [husband] behind some shelving in the basement," repeatedly struck him with the shovel, and ordered him to lie on the floor. *Id.* at 1266. Meanwhile, the wife laid terrified in a different part of the basement. *Id.* Johnson then returned to the wife, stripped her, tied her hands behind her, and forced her to perform fellatio on him. *Id.* Johnson then raped and attempted to strangle her.

---

Code section 76-30-3 (1953) stated that "[e]very murder . . . perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life . . . is murder in the first degree." *Id.* (second and third alterations in original) (citing UTAH CODE § 76-30-3). A prior case had interpreted that statute to require that the act "greatly dangerous to the lives of others must be directed against people generally . . . and not against any particular person." *Id.* (alteration in original) (quoting *State v. Russell*, 145 P.2d 1003, 1009 (Utah 1944)).

*Id.* When the wife "went limp, he began bludgeoning her with the shovel handle he had used on her husband." *Id.* After she regained consciousness, Johnson had left. *See id.* She called out to her husband and heard a moan. *Id.* The next morning, she left in search of help. *Id.* Police officers subsequently found husband's body naked with his hands tied and his head in a pool of blood. *Id.* He had received at least twelve blows to the head. *Id.*

¶94 On appeal, we recognized that we had previously interpreted the great risk of death factor "to apply when the defendant created a setting in which he placed persons other than the victims at great risk of death 'within a brief span of time in which were formed a concatenating series of events.'" *Id.* (quoting *Pierre,* 572 P.2d at 1355). We then stated that the standard announced in *Pierre* "require[d] clarification to permit a meaningful application of the language of section 76-5-202(1)(c) to the facts of this case." *Id.*

¶95 Our clarified standard provided:

> A proper reading of the statute requires an examination of the manner in which the killing occurred and consideration of whether the knowing and intentional killing took place under circumstances in which the actor knowingly exposed someone other than himself and his victim to a great risk of death because of his knowing or intentional murder of his victim.

*Id.* "Section 76-5-202(1)(c) properly applies to situations in which the defendant kills his victim in a manner by which he knows he is gravely endangering others." *Id.* This clarified standard zeroes in on whether the "manner" by which the defendant killed the victim placed the third party in a great risk of death.

¶96 To clarify our standard, we looked favorably on the New Jersey Superior Court's interpretation of that state's grave risk of death aggravating factor. *Id.* at 1267. There, the court stated:

> [T]he facts must include a knowing or purposeful state of mind *vis-a-vis* the creation of a great risk of death, that there be a likelihood or high probability of great risk of death created, not just a mere possibility . . . and that there be at least another person within the 'zone of danger' created by defendant's conduct.

*Id.* (alterations in original) (quoting *State v. Price*, 478 A.2d 1249, 1260 (N.J. Super. Ct. Law Div. 1984)). And we cautioned that while there may be cases where a defendant may be guilty of the aggravator

where the endangered third party is physically removed from the defendant's conduct, "such cases require a careful consideration of a defendant's intent and knowledge of the risk and the endangered person's proximity in time and place to the murder." *Id.*[23]

¶97 Employing this clarified standard, we held that the aggravator did not apply in *Johnson* because "[t]he State [had] produced no evidence indicating that [wife] was placed at grave risk of death by defendant's battery of [husband]." *Id.* at 1267. We focused on whether the act that killed the victim—in that case, the battery—placed the third party in a great risk of death. Because it did not, the aggravator did not apply.

---

[23] The majority opinion points out this language in *Johnson* as demonstrating that the relevant conduct in terms of the great risk of death aggravator is not limited to the "endangered person's condition at the exact time of the murderous act." *Supra* ¶ 45. That is correct. As discussed herein, the focus should be on the manner by which the defendant kills his victim—not a specific fatal act or moment. There may be circumstances where the manner by which the defendant harms and kills his victim places others in great risk of death—even though not at the same moment or place. An obvious example of the potential for spatial distance—a bomb. A defendant who placed a bomb intending to kill one person with the knowledge that others nearby would be in a great risk of death, would have engaged in conduct that properly falls within this aggravator. It is more difficult to imagine circumstances where there is a temporal distance between the acts that killed the victim and the creation of the great risk of death—but there are some we can think of: deploying poison or gas that kills the victim and leaks such that it places others in great risk of death or constructing a trap for the homicide victim that later places others in great risk. These possibilities exist such that we cannot rule out that the aggravator could be satisfied by conduct that did not create the great risk of death to a third party at the same time as the homicide. But these are likely to be the exception to the rule. And as we cautioned in *Johnson*, such circumstances will require a "careful consideration of a defendant's intent and knowledge of the risk and the endangered person's proximity in time and place to the murder." 740 P.2d at 1267.

¶98 In contrast, we held that Johnson's conduct did "come within the aggravating circumstances described in Utah Code Ann. § 76-5-202(1)(d) (Supp. 1986)." *See id.* That subsection provided "[t]he homicide was committed while the actor was engaged in the commission of, or an attempt to commit . . . aggravated sexual assault." UTAH CODE § 76-5-202(1)(d) (Supp. 1986). We determined that the evidence supported the conclusion that the husband "was murdered *while* defendant was engaged in assaulting" wife. *Johnson*, 740 P.2d at 1267. We then reviewed how two other courts had defined that type of "while." *Id.* at 1267–68. We quoted the Indiana Supreme Court's reasoning that "'while committing' denotes a continuing chain of events" under its felony murder statute. *Id.* at 1267 (citation omitted). Indiana then utilized Webster's dictionary to conclude that the word "while" "clearly implies a continuity of action over a span of time." *Id.* at 1268. We then quoted the Supreme Court of Ohio's conclusion that "while" does not mean that one act "must occur at the same instant" as a separate act, but only that it occur "as part of one continuous occurrence." *Id.* (citation omitted) (internal quotation marks omitted). We noted that we had previously adopted the *res gestae* analysis in the context of first degree murder. *Id.* (citing *State v. Weddle*, 511 P.2d 733 (Utah 1973)). Therefore, because Johnson's murder of husband and assault on wife "were one continuous, interrelated occurrence," the evidence supported that aggravator. *Id.*[24] In contrast, this "one continuous, interrelated occurrence" was insufficient to demonstrate that the great risk of death aggravator applied.

¶99 Comparing the analysis of these two aggravating factors in *Johnson*, it becomes evident that the great risk of death aggravator requires a closer temporal connection between the homicide and the creation of a great risk of death. That is, in *Johnson*, we determined that the "defendant's murder of [husband] and assault on [wife] were one continuous, interrelated occurrence," satisfying the aggravator that the murder was committed while Johnson was engaged in the commission of aggravated sexual assault, but not that

---

[24] In *Johnson*, we also interpreted "the attack that led to [husband's] death" as "in part undertaken to facilitate defendant's assault on [wife]." 740 P.2d at 1268. While this played into our perception of the facts, it is unclear whether or how this interpretation factored into our conclusion that the evidence supported the assault aggravating factor.

he knowingly created a great risk of death to wife due to the killing of husband. *Id.* at 1266–68.[25] In *Pierre*, by contrast, evidence that "the killing of the three victims and the creation of a setting of great risk of death to the two surviving victims occurred within a brief span of time in which were formed a concatenating series of events" was sufficient to satisfy the great risk of death aggravator. 572 P.2d at 1355.

¶100 Examining closely our treatment in *Johnson* of the two aggravating factors there, and the requirement that the great risk of death be caused by the act that constituted the homicide, not simply part of one "series of events," reveals that while we spoke in terms of "clarifying" *Pierre*, in fact we significantly narrowed *Pierre* to the point of overruling it *sub silentio*.[26] Being part of one series of events

---

[25] The majority opinion recognizes that in *Johnson* there "were other acts directed at the wife that may arguably have been connected to the killing, and that may have caused her great risk of death," but it concludes that these facts are immaterial to the discussion in *Johnson*. *Supra* ¶ 44 n.9.

The State raised that argument before the *Johnson* court. The State interpreted *Pierre* and the language of subsection (1)(c) as "not limit[ing] the creation of a grave risk of death to another to the actor's act of killing the murder victim, [therefore] defendant could properly be found guilty of first degree murder." Applying this interpretation to the facts of the case, the State argued that even though the acts committed against the husband were distinct from those against the wife, "it is clear that, within a brief span of time, [Johnson] both endangered [wife's] life by beating her and killed [husband]. In this sense, the life endangering conduct was committed in conjunction with the killing. This situation falls within the circumstance described by subsection (1)(c) . . . ."

In the face of this argument, the *Johnson* court concluded that "[t]he State produced no evidence indicating that [wife] was placed at grave risk of death by defendant's battery of [husband] . . ." 740 P.2d 1264, 1267. The *Johnson* court's conclusion that those acts were irrelevant to the great risk of death aggravator demonstrates that *Johnson*'s "clarification" narrowed the test we announced in *Pierre*.

[26] In *Pierre* we articulated the great risk of death aggravator in the following way: "[t]he evidence fully sustains that the killing of the three victims and the creation of a setting of great risk of death to the two surviving victims occurred within a brief span of time in

(continued . . .)

was not sufficient in *Johnson* to satisfy the section 76-5-202(1)(c) aggravator. Rather, the *Johnson* court focused on whether the manner by which the defendant killed his victim was the manner by which he knowingly endangered others. 740 P.2d at 1266.

¶101   That leaves us with the uncomfortable conclusion that while *Johnson* spoke in terms of clarifying, rather than overruling, the two cases are at loggerheads. The facts in *Pierre* do not satisfy the *Johnson* test. Indeed, the manner by which Pierre killed his victims—with individual shots fired only inches away from each individual victim's head—did not themselves place the remaining victims in a great risk of death.[27] I would conclude that *Johnson* narrowed the scope of the aggravating factor and directed us to focus on the action that constituted the homicide, and whether *that* action created a great risk of death to a third party.

¶102   Many other states have similar aggravating factors in their statutes. And they have interpreted the aggravating factor in a wide variety of ways. Arizona courts, for example, have applied the aggravating factor only where individuals were within the zone of danger created by the defendant's murderous act and the defendant did not separately intend to kill these bystanders. *See, e.g.*, *State v. Johnson*, 133 P.3d 735, 748 (Ariz. 2006) (en banc) (discussing four factors relevant to whether the great risk of death aggravator exists:

---

which were formed a concatenating *series of events*." 572 P.2d at 1355 (emphasis added). By contrast, our clarified standard in *Johnson* stated that

> [a] proper reading of the statute requires an examination of the manner in which the killing occurred and consideration of whether the knowing and intentional killing took place under circumstances in which the actor knowingly exposed someone other than himself and his victim to a great risk of death *because of* his knowing or intentional murder of his victim.

740 P.2d at 1266 (emphasis added).

[27] If there was a likelihood or high probability that a shot fired may have hit another person—such as a stray shot—this would satisfy the great risk of death aggravator. Here, there was no evidence before the jury that the shots fired at Stephen put Isabel at a great risk of death.

(1) "the third person's proximity to the victim," (2) "whether the defendant's actions were during 'the murderous act itself,'" (3) "whether the defendant intended to kill the third party," and (4) "whether the defendant engaged in sufficiently risky behavior toward the third person" (citations omitted)); *State v. Johnson*, 710 P.2d 1050, 1055 (Ariz. 1985) (en banc) (declining to apply the aggravator when "the other person endangered was a victim or intended victim of the criminal conduct," that is, the evidence indicated defendant intended to kill both victims).

¶103   Florida courts have adopted a similar approach. *See, e.g.*, *Raulerson v. State*, 420 So. 2d 567, 571 (Fla. 1982) (affirming application of the aggravator where the defendant engaged in a shoot-out with police in a restaurant, given the risk that one of the four bystanders caught between the defendant and the officers or a police officer "would be hit and killed"); *White v. State*, 403 So. 2d 331, 337 (Fla. 1981) (per curiam) (concluding that the aggravator did not apply where each of the six murders were "effected by a gunshot blast to the head" where "the gun was discharged at close range and involved relatively little risk of injury to other persons in the room," and characterizing the deaths as "six discrete homicides"), *abrogation on other grounds recognized by Holland v. State*, 773 So. 2d 1065 (Fla. 2000)).

¶104   Other jurisdictions interpret and apply the aggravator more broadly. Oklahoma courts, for example, apply the factor if a defendant threatens the life of another individual and appears to have the ability to take that person's life, even if that person was not otherwise in the zone of danger created by the defendant's conduct. *See Lockett v. State*, 53 P.3d 418, 430 (Okla. Crim. App. 2002) ("[E]vidence is sufficient to support the aggravating circumstance . . . where a defendant during the continuing course of conduct in which a murder is committed, threatens the life of another and has the apparent ability and means of taking that person's life." (first alteration in original) (citation omitted)).

¶105   Louisiana courts apply a similar factor more broadly, reasoning that it applies when a defendant causes the death of one person and creates the required risk to another through a single course of conduct. In *State v. Williams*, 480 So. 2d 721, 722–27 (La. 1985), the Louisiana Supreme Court reviewed prior interpretations of the aggravating circumstance that the defendant "knowingly created a risk of death or great bodily harm to more than one person." One case that the Louisiana court reviewed had "considered, but rejected, the argument that the aggravating

circumstance contemplated only a single act (such as exploding a bomb in a crowd) which killed one person and at the same time created the risk of death or great bodily harm to at least one more person." *Id.* at 723. In that prior case, the Louisiana court had concluded—in dicta—that "the more likely intention of the Legislature was to include the risk of multiple deaths (or great harm) created by a 'single consecutive course of conduct' in which at least one person was killed." *Id.* at 723–24 (footnote omitted). After reviewing several cases, the *Williams* court reaffirmed the statutory construction

> that the Legislature intended to classify among the most serious murders those in which the murderer specifically intended to kill more than one person and actually caused the death of one person and the risk of death or great bodily harm to at least one other person, all by a single act or by a series of acts in a single consecutive course of conduct.

*Id.* at 726.[28]

¶106 In contrast, the changes our Legislature made to the statute after *Pierre* support the conclusion that the interpretation we set forth in *Johnson* hews closer to how the Legislature intended the aggravator to function. As highlighted above, the Legislature has added the language "incident to one act, scheme, course of conduct,

---

[28] Across the variations in interpretations, a significant number of jurisdictions recognize that indiscriminate shooting in a crowded area satisfies the aggravator. *See, e.g.*, *Commonwealth v. DeJesus*, 880 A.2d 608, 611–12, 619 (Pa. 2005) (concluding that the aggravator was satisfied based on evidence that the defendant "spray[ed] bullets up and down" a street from his position on a rooftop, killing one victim and injuring two others); *State v. McCall*, 677 P.2d 920, 934 (Ariz. 1983) (en banc) (declining to apply the aggravator where the shooting was "purposeful and intentional," not "random or indiscriminate"); *State v. Simants*, 250 N.W.2d 881, 891 (Neb. 1977) (interpreting the aggravator "to cover those situations where the act of the defendant jeopardizes the lives of more than two other persons, such as the use of bombs or explosive devices, the indiscriminate shooting into groups, or at a number of individuals, or other like situations"). This appears to be the aggravator's common ground amidst otherwise varying interpretations.

or criminal episode" to certain aggravators. The first addition was to subsection (1)(b) in 1983, after *Pierre* and prior to *Johnson*.[29] *See* 1983 Utah Laws 434. The Legislature did not make a similar change to subsection (1)(c). *See id.* This leads us to conclude that the Legislature broadened subsection (1)(b)'s reach between those two cases in a way that it did not to (1)(c). The contrast suggests that the relevant time frame for the great risk of death aggravator is narrower than for the aggravator where two or more persons are killed. If the Legislature had amended the great risk of death factor to state "the homicide was committed incident to an act, scheme, course of conduct, or criminal episode during which the actor knowingly created a great risk of death to a person other than the victim and actor," then we would understand the factor to apply to conduct beyond the manner by which the defendant killed the victim. Without this language, however, we are restricted to focusing more narrowly on the fatal conduct.

¶107 The court of appeals understandably attempted to reconcile *Pierre* and *Johnson.* And in doing so, promulgated a three-factor test:

> (1) the temporal (or chronological) relationship between any actions the defendant may have taken towards the third party and the acts constituting the murder; (2) the spatial relationship, or proximity, between the third party, the murder victim, and the defendant at the time of the acts constituting the murder; and (3) whether and to what extent the third party was actually threatened by the assailant, either by direct threats or by indirect means such as the risk of stray or ricocheting bullets.

*State v. Sosa-Hurtado*, 2018 UT App 35, ¶ 31. The court of appeals then applied the factors and determined that "there was sufficient evidence to support the trial court's decision to allow the aggravator to be presented to the jury." *Id.* ¶ 36. "Defendant shot at [Isabel] mere seconds before shooting and killing [Stephen]," "[Isabel] was

---

[29] The Legislature subsequently added this language in subsections (1)(d), (1)(e), and (2) as well. 2005 Utah Laws 922 (adding subsection (1)(e), which includes this language); I 2006 Utah Laws 861 (adding this language to subsection (1)(d)); II 2007 Utah Laws 2075 (adding subsection (2), which includes this language).

no more than seven feet away from [Stephen], and some five feet away from Defendant, when Defendant shot [Stephen]," and "Defendant actually fired a rifle shot at [Isabel] at close range just seconds before he shot [Stephen]." *Id.*

¶108   I have concerns with the court of appeals test on a couple of levels. First, because the test was attempting to reconcile *Pierre* and *Johnson*, it concluded that if the creation of a great risk of death and the homicide occur "within a brief span of time," they "constitute[] a concatenating series of events," and "could be considered as part of the same course of conduct." *Id.* ¶ 33 (citation omitted) (internal quotation marks omitted). Although this language is an accurate reference to *Pierre*, I would move away from that interpretation of the aggravating factor. Rather, there must be a closer causal relationship between the manner in which the defendant killed the victim and the creation of a great risk of death to a third party.

¶109   My second concern is with the factor that instructs that "courts should examine whether and to what extent the third party was actually threatened with harm during the course of the murderous events." *Id.* ¶ 35. This factor evokes the necessary question of whether there was a likelihood or high probability that the third person faced a great risk of death. But it risks leaving behind the question of whether the defendant "knowingly created" the great risk of death. *See* UTAH CODE § 76-5-202(1)(c); *see also Johnson*, 740 P.2d at 1267 ("[T]he facts must include a knowing or purposeful state of mind *vis-a-vis* the creation of a great risk of death . . . ." (first alteration in original) (citation omitted) (internal quotation marks omitted)).

¶110   Third, and at a larger policy level, this court has lately been cautioning against reliance on multifactor tests and highlighting the way these tests can distort the relevant inquiry. *See, e.g., Met v. State*, 2016 UT 51, ¶¶ 89–90, 388 P.3d 447 (disavowing a multifactor test and reasoning that parties are "not required to view the factors [outlined in a prior decision] as a mandatory checklist," but should instead focus on the text of the relevant rule); *State v. Cuttler*, 2015 UT 95, ¶¶ 2, 18–21, 367 P.3d 981 (explaining that it is "not appropriate for a district court to moor its . . . analysis entirely and exclusively to" factors that were not part of the text of the rules); *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841 (clarifying that "courts are bound by the text of [our rules], not the limited list of considerations" we had outlined in a prior decision), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. While

nice in theory, multifactor tests tend to corrode into a checklist divorced from the legal question at issue. And they encourage courts to balance the factors against each other in a way that can distract from the ultimate question to be answered. The majority plants a test into our jurisprudence that, if history is any guide, we will eventually have to prune back or dig out.[30]

¶111 I would therefore not be inclined to adopt the court of appeals' three-factor test, but instead emphasize the statutory language and the interpretation of this court in *Johnson* that the murderous acts must create the great risk of danger to the third party.[31] But that is not to say that the court of appeals was off base in identifying temporal and spatial proximity as considerations that can help illuminate the question. To decide whether evidence supports the notion that a defendant placed a third party at great risk of death, finders of fact will need to examine the third party's proximity to a defendant's murderous act.

---

[30] The majority believes this concern is overblown because it is simply "identifying a range of factors of possible relevance to the statutory inquiry as elaborated in our case law." *Supra* ¶ 39 n.9. I have no doubt that is the majority's intent, but we have consistently seen how these types of lists transform into balancing tests. The majority may be right that this one will be different, but I suspect that this thinking is, much like Samuel Johnson once described in a much different context, "the triumph of hope over experience." JAMES BOSWELL, BOSWELL'S LIFE OF JOHNSON (ebook), https://www.gutenberg.org/files/1564/1564-h/1564-h.htm.

[31] The majority opinion characterizes our interpretation of section 76-5-202(1)(c) as limiting the great risk of death to only the "final act that specifically causes the victim's death" and the "precise moment of [the] murderous act." *Supra* ¶¶ 34–35. Not so. The *Johnson* court wrote that "[s]ection 76-5-202(1)(c) properly applies to situations in which the defendant kills his victim in a manner by which he knows he is gravely endangering others." 740 P.2d 1264, 1266. We therefore focus on the "manner" by which the defendant kills the victim. The "manner" is not limited to those precise acts that caused the death, but the "manner" is limited to those acts that were directed at the victim who was killed. The shots Sosa-Hurtado fired at Isabel were not directed at Stephen. The shots Sosa-Hurtado fired at Stephen did not gravely endanger Isabel.

¶112 The ultimate question asks whether "some evidence exists from which a reasonable jury could find," *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183, that the shots aimed at Stephen created a "likelihood or high probability," not merely a "possibility," of great risk of death to Isabel. *Johnson*, 740 P.2d at 1267.

¶113 Because the statutory language directs us to focus on whether the conduct that constituted the homicide created a great risk of death, I would focus on the conduct that killed Stephen. There must be sufficient evidence that Sosa-Hurtado had a "knowing or purposeful state of mind *vis-a-vis* the creation of a great risk of death, that there be a likelihood or high probability of great risk of death created, not just a mere possibility." *Id.* (citation omitted); *see also* UTAH CODE § 76-5-202(1)(c) ("[T]he actor knowingly created a great risk of death to a person other than the victim and the actor.").

¶114 Sosa-Hurtado fired two sets of shots inside the shop. He first fired one shot at Isabel, missing him but shattering a glass casing which sent glass and wood into Isabel's leg and caused him to fall.[32] Because these were not the shots that killed Stephen, they cannot form the basis for the great risk of death aggravator.

---

[32] As Sosa-Hurtado recognized in his brief, this "shooting no doubt amounts to an aggravated assault or attempted homicide of [Isabel]. For reasons unknown, that was not charged in the Amended Information." In other words, it appears, at least to Sosa-Hurtado, that the facts would have supported instructing the jury on another aggravating factor. *See, e.g.*, UTAH CODE § 76-5-202(1)(b) ("[T]he homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons were killed, or during which the actor attempted to kill one or more persons in addition to the victim who was killed"). And like Sosa-Hurtado, we do not see anything in the record that explains why the State did not charge the other aggravator.

This also speaks to the "real practical difficulties" the majority sees in my reading of the statute. *Supra* ¶ 45 n.11. The majority thinks that a defendant could avoid the aggravator "despite taking multiple shots at both his eventual victim and another person positioned closely nearby." *Id.* Depending on the circumstances, the majority could be right, the aggravator in section 76-5-202(1)(c) may not be present if the shots that killed the victim did not place the second person at great risk of death. But this does not mean that the defendant may not have committed aggravated murder because the

(continued . . .)

¶115 After shooting towards Isabel, Sosa-Hurtado turned to face Stephen and fired the second set of shots. He fired a shot at Stephen that hit Stephen's hand and caused him to fall to the floor behind the counter.[33] With his back to Isabel, Sosa-Hurtado leaned over the counter, positioned the rifle only inches from Stephen's chest, and fired two fatal shots. Only a few feet away, Isabel felt the air displaced by the bullets, as he began to get up from the floor and move towards Stephen.

¶116 Sosa-Hurtado argues in his brief that "[t]he shooting of [Stephen] did not place [Isabel] in the 'zone of danger,' i.e., a zone of 'likelihood or high probability of great risk of death.'" Sosa-Hurtado contends that "[a]t the time of the killing of [Stephen], [Isabel] was simply not within the zone of danger as the assailant had his back to [Isabel], who was on the ground, and [Stephen] was in an entirely different part of the Smoke Shop." He also argues that "there was no evidence, expert or otherwise, that" his use of a "high-powered rifle . . . increased the relative risk of ricochets" to Isabel. And therefore, while "there might possibly have been a ricochet," there was not "evidence before the trial court that there was a 'likelihood or high probability' of such an occurrence." The State responds that "the evidence supports that Isabel was close enough to Stephen when Defendant shot Stephen for Isabel to feel the bullets pass by him. Thus, the evidence supports that . . . Isabel was in great danger at the exact moment Defendant shot at and killed Stephen."

¶117 The court of appeals considered both the shots fired at Stephen and the shots fired at Isabel as it concluded that the evidence supported the aggravator. *Sosa-Hurtado*, 2018 UT App 35, ¶ 36. With regard to the shots fired at Stephen, the court of appeals wrote that "[Isabel] was no more than seven feet away from [Stephen], and some five feet away from Defendant, when Defendant shot [Stephen]—in close enough physical proximity that [Isabel] could feel the muzzle blast from the shots targeting [Stephen]." *Id.* The court of appeals reasoned that

---

aggravator in section 76-5-202(1)(b) very well may apply in the hypothetical the majority propounds.

[33] At this point, Isabel had fallen and was lying on the ground to the right of Sosa-Hurtado. Isabel was therefore not in the line of sight of Sosa-Hurtado as he fired the shot that hit Stephen's hand.

> [e]ven though [Isabel] was not in the direct line of fire at the time Defendant shot [Stephen], his close physical proximity to Defendant and [Stephen] at the time Defendant shot [Stephen], coupled with the fact that Defendant had actually fired a shot at [Isabel] just seconds earlier, is sufficient for [Isabel] to properly be considered within the "zone of danger."

*Id.* (citation omitted).

¶118   I disagree with the court of appeals' assessment in two ways. First, freed from the "concatenating series of events" language, I would not consider the shots fired directly at Isabel to be part of the murderous conduct the finder of fact should have examined to determine whether the aggravator was present.

¶119   Second, the evidence does not support the conclusion that Isabel was in a great risk of death when Sosa-Hurtado fired shots at Stephen. When Sosa-Hurtado fired the first shot at Stephen, Isabel was on the ground behind the counter to the right of Sosa-Hurtado. And when Sosa-Hurtado shot and killed Stephen, he had his back to Isabel. In addition, Sosa-Hurtado fired the two fatal shots with the gun barrel positioned only inches away from Stephen's chest. Although Isabel was on the ground approximately only four feet away from Stephen at the time that Sosa-Hurtado killed Stephen, the State did not present "believable evidence," *see State v. Emmett*, 839 P.2d 781, 784 (Utah 1992), that Isabel faced a likelihood or high probability of a great risk of death.

¶120   I also disagree with the court of appeals' assessment that Isabel's ability to feel the "muzzle blast," was evidence that he was in a great risk of danger by the shots fired at Stephen. *See Sosa-Hurtado*, 2018 UT App 35, ¶ 36. Isabel testified that he felt "like a wind, like an air pulling me out of the way" from the shots fired at Stephen. Whether we call this sensation a "muzzle blast" or a "wind," these shots do not indicate that Isabel faced a likelihood or high probability of a great risk of death. He may have faced a possibility of death, but the aggravator requires more. *See Johnson*, 740 P.2d at 1267.

¶121   The State argues that "a reasonable jury could find that the evidence supported that the risk to Isabel when Defendant repeatedly shot at Stephen with a high-powered rifle included the possibility of a ricochet bullet." It is easy to speculate about a risk of ricochet, but the evidence presented at trial does not support the conclusion that the bullets fired by Sosa-Hurtado actually ricocheted

or that there was a likelihood of ricochet. The sufficiency of the evidence standard requires "some evidence . . . from which a reasonable jury" could find that Isabel was in a great risk of death from the shots fired at Stephen. *See Montoya*, 2004 UT 5, ¶ 29. We thus agree with Sosa-Hurtado that while "there might possibly have been a ricochet," there was not "evidence before the trial court that there was a 'likelihood or high probability' of such an occurrence."

¶122   The court of appeals concluded that there existed evidence from which a reasonable jury could conclude that Sosa-Hurtado's killing of Stephen placed Isabel in a great risk of death. *Sosa-Hurtado*, 2018 UT App 35, ¶ 36. I disagree and would vacate the aggravator and remand to the trial court for appropriate modification of the judgment and sentence.

———————